# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01620-SCT

*O.W.O. INVESTMENTS, INC.*

*v.*

*STONE INVESTMENT COMPANY, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/14/2008 |
| TRIAL JUDGE: | HON. D. NEIL HARRIS, SR. |
| COURT FROM WHICH APPEALED: | STONE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | NICHOLAS VAN WISER |
| ATTORNEYS FOR APPELLEE: | JACK PARSONS |
| | TADD PARSONS |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 04/08/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     O.W.O. Investments, Inc., commenced a lawsuit against Stone Investments, Inc. (Stone Investments); John Diamond, individually, John Diamond; d/b/a Stone Ready Mix, LLC; and Diamond Disposal, Inc. (collectively, "Diamond"). The action involved a contract and an amended contract providing for O.W.O.'s purchase from Diamond of three hundred acres of land for a landfill in Stone County. O.W.O. alleged that Diamond had misrepresented that he owned the entire three-hundred-acre parcel when, in fact, 40.05 acres

of the land were owned by Stone Investments. O.W.O. alleged that attorney Jack Parsons[1] had represented Diamond at the execution of the contract. O.W.O. further alleged that Parsons also was the attorney for Stone Investments, and that Parsons had known, when the contract and the amended contract were executed, that the 40.05 acres were owned by Stone Investments, not Diamond. O.W.O. asserted claims for seller's breach of warranties and representations, misrepresentation and fraud, imposition of a construction lien, and damages in the amount of $115,034, plus punitive damages. O.W.O. later filed a second amended complaint asserting a claim for tortious interference with contract.

¶2. The Chancery Court of Stone County denied Diamond's motion for summary judgment and granted Stone Investments's motion for summary judgment. O.W.O. voluntarily dismissed Diamond and pursued this appeal against Stone Investments, arguing that summary judgment was improper. Stone Investments argues that summary judgment was appropriate because, prior to O.W.O.'s execution of the amended contract, O.W.O. was placed on notice by a November 9, 2006, title opinion that the 40.05 acres were not included in Diamond's real estate holdings. Stone Investments also argues that O.W.O. incurred no damages because O.W.O. never elected to purchase the property pursuant to the amended contract.

### FACTS

¶3. On September 20, 2006, O.W.O. and Diamond executed a statement of intent to enter into a contract to purchase real estate. On September 28, 2006, O.W.O. and Diamond

---

[1] Parsons represented Diamond and Stone Investments before the chancery court and he represents Stone Investments on appeal.

2

entered into a "Preliminary Contract for Purchase and Sale of Real Estate, Personal Property & Equipment." The subject property included three hundred acres of real estate in Stone County, free and clear of all liens and encumbrances. In the contract, Diamond represented and warranted that he had title to the three hundred acres. The acreage included a sixty-acre landfill, only ten acres of which had been approved by the Mississippi Department of Environmental Quality (MDEQ). The contract placed the responsibility upon O.W.O. to obtain MDEQ approval. The purchase was to include all the assets of John Diamond's two businesses, Stone County Mix, LLC, and Diamond Disposal, Inc. The contract provided for a nonrefundable earnest-money deposit of $50,000 payable from O.W.O. to Diamond on or before September 28, 2006, to be credited against the purchase price. Diamond represented that all permits, licenses, zoning, and other authorizations to conduct business as a concrete plant and disposal site were "fully and completely transferrable or assumable by Purchaser in their present form and condition and without condition or modification."

¶4. On November 17, 2006, O.W.O.'s attorney, David Wheeler, sent Diamond's attorney, Parsons, a letter concerning the transaction. Wheeler stated that his review of the title had revealed that Diamond actually had title to only 259.05 acres, not the full three hundred acres under contract. The missing acreage, consisting of a 40.05-acre parcel, was owned by Stone Investments. Wheeler believed that Stone Investments had agreed to sell Diamond the 40.05-acre parcel for $160,000 so that Diamond could include it in the sale to O.W.O. Wheeler further stated that title to the 40.05 acres was not insurable and that a title-confirmation suit would be required to satisfy the title insurance company. Wheeler proposed that the parties take the following steps: (1) Stone Investments convey the property to Diamond in exchange

3

for a deed of trust on the property for $160,000, payable on demand within ninety days; (2) Stone Investments and Diamond provide a signed letter of instruction to Wheeler to disburse $160,000 from the closing proceeds to Stone Investments, and an executed release of the deed of trust; (3) Diamond and O.W.O. execute a modification to the contract providing for two closing dates, the first for the 259.05 acres, and the second for the 40.05 acres, to take place after resolution of the title issues; (4) Wheeler prepare a suit to confirm title to the 40.05 acres in the name of Diamond.

¶5. Accordingly, on November 20, 2006, the parties entered into an amended contract that superceded the September 28, 2006, contract. The amended contract provided for O.W.O.'s purchase of the three hundred acres in two parcels, Parcel A-1 for $1,620,000, and Parcel A-2 for $80,000. Parcel A-2 comprised the 40.05-acre parcel. The amended contract stated that O.W.O. had paid Diamond the $50,000 nonrefundable earnest-money deposit on or before September 28, 2006, to be credited against the purchase price of Parcel A-1.[2] Diamond both represented and warranted he had merchantable title to the three hundred acres and that he would commence a suit to confirm title to Parcel A-2 "in order to obtain insurable and good and merchantable title to said Parcel A-2." The amended contract provided for a closing date on Parcel A-1 of on or before January 3, 2007, with O.W.O. to give Diamond seven days' written notice of the time and place of closing. The contract provided for a closing date on Parcel A-2 to be within fourteen days of the entry of a final, nonappealable order of the chancery court confirming fee simple title to Parcel A-2 in John Diamond.

---

[2] The $50,000 was not held in escrow, but was paid directly to John Diamond.

4

¶6.     On December 28, 2006, Wheeler sent a letter to Parsons requesting an extension of the closing date due to two problems. First, O.W.O. had not been furnished any evidence that the 40.05 acres had been conveyed to Diamond by Stone Investments. Second, due to amendments to the MDEQ rules and regulations concerning the operation of landfills, O.W.O. had been unable to confirm that the existing permit to operate the ten-acre landfill could be assumed by O.W.O. Wheeler averred that these two problems constituted material misrepresentations under the amended contract. Therefore, he requested extension of the January 3, 2007, closing date by thirty days, assuming O.W.O. had received written verification that the permit was transferrable, and assuming O.W.O. had been furnished proof of the transfer of the 40.05 acres to Diamond and the initiation of a title-confirmation suit. In a January 2, 2007, letter from Wheeler to Parsons, Wheeler stated he had received no reply to the December 28, 2006, letter. Wheeler stated that O.W.O. was unwilling to close until the issues were resolved.

¶7.     On January 4, 2007, O.W.O. filed a complaint for specific performance and damages. O.W.O. alleged that during due diligence, questions had arisen as to whether certain environmental permits, licenses, zoning, and other authorizations were transferrable, and that Diamond had misrepresented that he had title to the full three hundred acres of land, while in reality, 40.05 acres were titled in the name of Stone Investments. O.W.O. claimed that Diamond had refused its request for thirty days' additional time prior to closing to address these problems. On April 23, 2007, O.W.O. filed its first amended complaint for damages, requesting a return of the $50,000 earnest-money deposit, $40,034.80 in due-diligence

5

expenses for engineering services to determine whether there was compliance with MDEQ regulations, attorneys' fees, and punitive damages.

¶8. On April 20, 2007, Stone Investments filed a motion to dismiss for lack of jurisdiction. A basis for the motion was that, on March 19, 2007, it had sold the 40.05 acres to E-Z Disposal, Inc. In a response to the motion to dismiss, O.W.O. contended that a *lis pendens* on the 40.05 acres had been filed with the original complaint, which rendered the sale to E-Z Disposal, Inc., a nullity. On May 24, 2007, O.W.O. moved to add E-Z Disposal, Inc., as a necessary party. On September 20, 2007, the trial court entered an agreed judgment providing that the defendants would withdraw the motion to dismiss, and authorizing O.W.O. to file an amended complaint within fifteen days.[3]

¶9. Stone Investments answered and admitted its ownership of the 40.05 acres, and that Diamond had represented to O.W.O. that it had full title to and right to sell the three hundred acres, including the 40.05 acres owned by Stone Investments. Stone Investments denied that Parsons had represented Stone Investments in the matter. Stone Investments counterclaimed for fraud, alleging that O.W.O. had fraudulently entered into a contract to purchase property, because O.W.O. continually had requested extensions and orally had offered an amount lower than the contract price. Stone Investments requested specific performance of the contract, removal of the *lis pendens*, and $400,000 in damages caused by the placement of the *lis pendens* on the property.

¶10. On April 30, 2008, Diamond moved for summary judgment. On the same day, Stone Investments filed a motion for summary judgment, asserting that a contractual relationship

---

[3] E-Z disposal was never added.

between Stone Investments and O.W.O. had never existed, and that there was no legal basis for the court to hold Stone Investments liable to O.W.O. for misrepresentations. Stone Investments requested dismissal from the lawsuit and cancellation of the *lis pendens*. Stone attached a copy of an unexecuted deed signed by Dana Parsons, the president of Stone Investments, conveying the 40.05 acres to Diamond, dated December 29, 2006.

¶11. O.W.O. filed responses to both motions. Its claims against Diamond centered upon Diamond's misrepresentations that the landfill was in compliance with MDEQ regulations. As to Stone Investments, O.W.O. asserted that there were genuine issues of material fact that: (1) Jack Parsons was an authorized agent for Stone Investments; (2) he was an active participant in the contract negotiations on behalf of Diamond; (3) he was aware that Diamond was unable to perform the terms of the contract because Stone Investments owned the 40.05 acres; and (4) Stone Investments had concealed its ownership of the 40.05 acres until after O.W.O. had paid the $50,000 nonrefundable earnest-money deposit to Diamond. O.W.O. argued that there was a genuine issue of material fact that Stone Investments, acting through Parsons, had fraudulently induced O.W.O. to pay Diamond the earnest-money deposit.

¶12. On May 22, 2008, O.W.O. filed a motion to disqualify Parsons due to his status as a necessary witness in his capacity as agent for Stone Investments. On August 13, 2008, O.W.O. filed a second amended complaint, adding a cause of action for tortious breach of contract and claiming an additional $110,000 in actual damages.

¶13. In his deposition, Parsons stated that he was the attorney for Stone Investments and had acted as its agent on some occasions. Parsons stated that Stone Investments had acquired the 40.05 acres from the First National Bank of Wiggins on August 29, 2006, after the bank

7

had acquired it in a foreclosure sale on August 18, 2006. He had been aware of the transaction at the time. Parsons stated that, in his representation of Diamond, he had participated in contract negotiations. However, he stated, it was not until after the September 28, 2006, contract that he first had become aware that this same 40.05-acre parcel was part of the three-hundred-acre parcel that his client, Diamond, had agreed to sell to O.W.O.

¶14. Dana Parsons, the president of Stone Investments,[4] testified that he had authorized Parsons to tell John Diamond that Stone Investments would sell the 40.05 acres to Diamond if needed for inclusion in the sale to O.W.O. He also had authorized Parsons to tell Diamond that Stone Investments would deliver a deed upon payment, and he had authorized Parsons to prepare a proposed deed conveying the 40.05 acres to Diamond. Dana Parsons testified that he would have executed the deed to Diamond upon receipt of the purchase price.

¶15. Robert Windham, the president of O.W.O., testified by affidavit that Parsons had held himself out as the agent of Stone Investments, who was authorized to negotiate on its behalf and bind the company. Windham testified that, after he had discovered that Diamond did not own the 40.05 acres, Parsons had told him Stone Investments would not enter into a contract with O.W.O. Instead, Parsons represented that Stone Investments would convey the 40.05 acres to Diamond if and when he had sold the property to O.W.O. O.W.O.'s attorney, Wheeler, found this plan unacceptable. Subsequently, Parsons told Windham he would prepare a deed conveying the 40.05 acres to Diamond.

¶16. Windham further testified that, on the closing date, O.W.O. had been prepared but unwilling to close due to Diamond's misrepresentations about the assets to be included in the

---

[4] Dana Parsons is Parsons's son.

sale, missing tax returns, missing employee lists, and missing MDEQ reports. Windham testified that O.W.O. wanted to close after these problems were resolved. Windham testified that, on January 4, 2007, he had obtained a letter from MDEQ stating that the landfill was noncompliant and that any successor in interest would be liable for bringing it into compliance. Windham testified that O.W.O. subsequently had purchased another piece of land and was no longer ready, willing, and able to buy from Diamond.

¶17. The summary judgment hearing occurred on June 19, 2008. The chancellor reserved ruling on the motion to disqualify Parsons and denied Diamond's motion for summary judgment. At an August 14, 2008, hearing, the chancellor granted Stone Investments' motion for summary judgment. The chancellor also removed the *lis pendens*. The parties agreed that O.W.O. would dismiss all claims against Diamond and pursue an appeal as to Stone Investments. The chancellor entered a final judgment, dismissing Stone Investments on August 25, 2008, *nunc pro tunc* August 14, 2008.

## STANDARD OF REVIEW

¶18. Our standard of review of the grant or denial of a summary judgment motion is de novo. *Kuiper v. Tarnabine*, 20 So. 3d 658, 660-61 (Miss. 2009). The trial court "shall" grant a summary judgment motion "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). Summary judgment is appropriate if the nonmoving party has not made a sufficient showing to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Kuiper*, 20 So. 3d at 661

9

(quoting *Smith ex rel. Smith v. Gilmore Mem'l Hosp., Inc.*, 952 So. 2d 177, 180 (Miss. 2007)).

## DISCUSSION

I. DID THE CHANCELLOR ERR BY GRANTING SUMMARY JUDGMENT TO STONE INVESTMENTS?

II. DID THE CHANCELLOR ERR BY NOT FINDING THAT PARSONS HAD A DUTY OF DISCLOSURE TO O.W.O. AS THE DUAL DISCLOSED AGENT OF DIAMOND AND STONE INVESTMENTS?

¶19. Although O.W.O. raises two issues on appeal, it provides no argument pertaining to the second issue. Accordingly, we do not address it, as this Court does not consider unsupported assignments of error. *Touchstone v. Touchstone*, 682 So. 2d 374, 380 (Miss. 1996). We note that our review of the grant of summary judgment embraces all relevant legal issues.

¶20. O.W.O. argues that there were genuine issues of material fact because there was sufficient evidence that Parsons had made a material misrepresentation that Diamond owned the entire three hundred acres under contract, and his misrepresentation constituted fraud and tortious interference with contract. The elements of fraud include:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.

*Mabus v. St. James Episcopal Church*, 884 So. 2d 747, 762 (Miss. 2004) (quoting *Franklin v. Lovitt Equip. Co.*, 420 So. 2d 1370, 1373 (Miss. 1982)). These elements must be proven by clear and convincing evidence. *Id.*

10

¶21. Stone Investments argues that there was no evidence on the element of damages because O.W.O. never elected to purchase the property by giving Diamond written notice within seven days of the time and place of closing. Because O.W.O. never elected to purchase, Stone Investments argues, it is not entitled to a return of earnest money. *See Gunn v. Heggins*, 964 So. 2d 586, 594 (Miss. Ct. App. 2007); *Hamilton v. Hopkins*, 964 So. 2d 586, 594 (Miss. Ct. App. 2003). Moreover, Stone Investments argues that, because O.W.O. knew the true state of the title to the 40.05 acres before it executed the November 20, 2006, contract, O.W.O. had actual knowledge, negating the element of fraud that requires the hearer to have been ignorant of the representation's falsity.

¶22. This Court finds that this case must be resolved through the application of agency principles. O.W.O. sued Parsons's client, Stone Investments, not Parsons individually. "The relationship between client and attorney, regardless of the variations in particular compensation agreements or the amount of skill and effort the attorney contributes, is a quintessential principal-agent relationship." *CIR v. Banks*, 543 U.S. 426, 436, 125 S. Ct. 826, 832, 160 L. Ed. 2d 859 (2005). For liability to attach to Stone Investments based on Parsons's misrepresentation, there must have been sufficient evidence to enable a jury to find that Parsons was acting as Stone Investments' agent at the time that he made the alleged misrepresentation. A principal-agent relationship is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Butler v. Bunge Corp.*, 329 F. Supp. 47, 49 (N.D. Miss. 1971). An agent may bind his or her principal through actual or apparent authority. *Barnes, Broom, Dallas and McLeod, PLLC v. Estate of*

11

*Cappaert*, 991 So. 2d 1209, 1211 (Miss. 2008). "Apparent authority exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Id.* The existence of apparent authority is a fact question for the jury. *Id.*

¶23. The crux of O.W.O.'s fraud claim is that it paid Diamond $50,000 in earnest money in reliance on Parsons's misrepresentation during negotiation and execution of the original contract that Diamond owned the entire three hundred acres. Parsons denied having had any knowledge at that time that his other client, Stone Investments, owned a portion of the land under contract. However, Parsons's status as the attorney for Stone Investments would have been sufficient to enable a jury to find that he had the requisite knowledge and was guilty of a misrepresentation. Nonetheless, even if Parsons committed a misrepresentation, viewing all of the evidence in the light most favorable to O.W.O., there was no evidence that Parsons was acting on behalf of Stone Investments at the relevant time. The evidence was that Parsons had represented Diamond during the negotiation and execution of the original contract; Stone Investments was not a party to that contract. No evidence tended to show that Stone Investments had cloaked Parsons with any authority to act on its behalf during the negotiation and execution of the original contract between Diamond and O.W.O. Rather, the evidence was that Stone Investments had authorized Parsons to negotiate with Diamond and to communicate with O.W.O. on its behalf only after O.W.O. had discovered that Stone Investments owned the 40.05 acres. Simply put, Stone Investments was not "at the bargaining table" during the negotiation and execution of the original contract. Because there

12

was no evidence that Parsons was acting on behalf of Stone Investments at the relevant time, his alleged misrepresentation did not bind Stone Investments as a matter of law, and Stone Investments was entitled to summary judgment.

¶24. Additionally and alternatively, and viewing the evidence in the light most favorable to O.W.O., O.W.O. waived its claim to recover the earnest money by entering into a new contract which superceded the original contract.[5] O.W.O. alleged that it had paid the earnest money in reliance on the fraudulent misrepresentation by Parsons during the negotiation and execution of the original contract. O.W.O. sought to recover the earnest money from Stone Investments as damages for Parsons's alleged fraudulent misrepresentation. It is undisputed that, when O.W.O. discovered the misrepresentation, it did not seek recission of the contract. Instead, with full knowledge that Diamond did not own the 40.05 acres, O.W.O. executed an amended contract providing that O.W.O. would close on the 259.05 acres on the original closing date of January 3, 2007, and would close on the 40.05 acres in a separate transaction to take place fourteen days after a lawsuit confirmed Diamond's merchantable title to that parcel.

¶25. It is well-established that "a buyer who has been deceived by material false representations in the procurement of a contract may elect to rescind and to be restored to the position he occupied at the time of sale." *Browder v. Williams*, 765 So. 2d 1281, 1285 (Miss. 2000). It also is well-established that:

---

[5] Even assuming the dissent's argument is correct, and the evidence was sufficient to create a genuine issue of material fact that Parsons was acting as Stone Investments's agent at the relevant time, O.W.O. waived any claim of fraud by entering into an amended contract.

13

> Where the person defrauded after having knowledge of the fraud enters into a new contract concerning the same subject matter, or an agreement modifying the original contract, or renews the original contract for an additional term, or asks favors, as, for example, requesting an extension of time for performance, he will ordinarily be regarded as having waived the fraud in the original transaction . . . .

*Hines v. Hambrick*, 210 Miss. 358, 368-69, 49 So. 2d 690, 694 (1951); *see Gardner v. Little*, 755 So. 2d 1273, 1276 (Miss. Ct. App. 2000) (stating that, "[i]f the Gardners felt that the Littles misrepresented the corporation's net worth or acted in bad faith, then they were required to either promptly rescind the contract or affirm the contract and maintain an action in damages"). Instead of seeking recission of the contract or affirming the contract and suing for damages, O.W.O. elected to execute an amended contract that superceded the original contract. The amended contract provided a course of action by which the title problem with the 40.05 acres would be remedied before the parties closed on that parcel. Therefore, by entering into the amended contract, O.W.O. waived its claim for the return of earnest money based upon the alleged fraudulent misrepresentation.

¶26. We turn to O.W.O.'s tortious-interference-with-contract claim. O.W.O. claims that Parsons's misrepresentation as to Diamond's landholdings during negotiation and execution of the original contract constituted tortious interference with contract. The elements of tortious interference with contract are:

> (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.

14

***Par Indus., Inc. v. Target Container Co.***, 708 So. 2d 44, 48 (Miss. 1998). The plaintiff must prove that an enforceable obligation existed between itself and another party, and that, but for the defendant's interference, the contract would have been performed. ***Id.*** Considering the evidence in the light most favorable to O.W.O., there was no evidence that Parsons was acting on behalf of Stone Investments during Diamond's negotiation of the original contract with O.W.O. Additionally, there was no evidence from which it could be inferred that Parsons had concealed Stone Investments's ownership of the land with the unlawful purpose of causing O.W.O. to suffer damage and loss, or that his conduct was calculated to cause damage to O.W.O. in its lawful business. We find that there was no genuine issue of material fact, and Stone Investments was entitled to a judgment as a matter of law.

## CONCLUSION

¶27.    Viewing the evidence in the light most favorable to O.W.O., Parsons was not acting on behalf of Stone Investments during the negotiation and execution of the original contract between Diamond and O.W.O., and any misrepresentation committed by Parsons during that time did not bind Stone Investments. Additionally and alternatively, O.W.O. waived any claim for the return of earnest money based upon fraud by executing the amended contract with full knowledge of the alleged misrepresentation. Accordingly, the trial court appropriately granted Stone Investments' motion for summary judgment.

¶28.    **AFFIRMED.**

**GRAVES, P.J., RANDOLPH, KITCHENS AND PIERCE, JJ., CONCUR. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., CARLSON, P.J., AND LAMAR, J.**

**DICKINSON, JUSTICE, DISSENTING:**

15

¶29. Because I cannot agree with majority's decision to affirm the chancellor's grant of summary judgment, I must respectfully dissent. The affidavit of Robert Windham, owner and CEO of O.W.O. Investments, Inc. states in pertinent part:

. . .

12. At all times during all negotiations which took place between myself and John Diamond, Jack Parsons represented to me that he was an authorized agent, (although not a principal) of Stone Investments and that he was authorized to negotiate for them and bind to said company.

13. At all times during said negotiations, Jack Parsons and Stone Investment were aware and fully knowledgeable that the 40.5 acres included in the 300 acres John Diamond was negotiating to sell to us was not owned by John Diamond but was, in fact owned by Stone Investment.

14. O.W.O. was induced to sign the contract, first by John Diamond's representation to O.W.O. that he owned the entire 300 acres that was the subject matter of the contract. This representation was made in spite of the fact and with the full knowledge and participation of Stone Investment by and through its agent, Jack Parsons, all the while knowing that 40.5 of the acres out of the total 300 was not, in fact, owned by John Diamond and Stone Investment, though its agent, Jack Parsons, did participate in this representation.

¶30. Parsons stated in his deposition that "people think that I am the, quote, master, end quote, of Stone Investment, which is quite erroneous." He admitted to acting as an agent of Stone Investments on occasion. Jack Parsons's son, Dana Parsons, is the president of Stone Investments. Viewing this evidence in the light most favorable to O.W.O., a question of material fact exists as to whether O.W.O. was induced to enter the contract and the later amended contract by the allegedly fraudulent representations of Stone Investments through its purported agent, Jack Parsons. And I respectfully disagree with the majority's conclusion

16

that "O.W.O. waived any claim of fraud by entering into an amended contract." Indeed, fraudulent inducement to enter into the amended contract is part of the plaintiff's claim. I would reverse and remand this case for a trial on the merits, and therefore must respectfully dissent.

**WALLER, C.J., CARLSON, P.J., AND LAMAR, J., JOIN THIS OPINION.**